UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| HILLSBOROUGH COUNTY | : | |
| AVIATION AUTHORITY, | : | |
| a body politic under the | : | |
| laws of The State of Florida, | : | Case No.:8:12-CV-2478-27 TGW |
|  | : | |
| v. | : | |
|  | : | |
| HERNANDO COUNTY | : | |
| Board of County Commissioners | : | |
| a body politic under the | : | |
| laws of The State of Florida | : | |
|  | : | |
| and | : | |
|  | : | |
| HERNANDO COUNTY | : | |
| AVIATION AUTHORITY | : | |
| a body politic under the | : | |
| laws of The State of Florida | : | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

Plaintiff Hillsborough County Aviation Authority (hereinafter the "Aviation Authority") hereby moves, pursuant to Fed. R. Civ. P. 65 and M.D. Fla. L.R. 3.01(a) and 4.06, for a preliminary injunction on its claims under the Lanham Act for false advertising (Count III), infringement of a federally registered trademark (Count I), and false designation of origin (Count II). The Aviation Authority likewise seeks a preliminary injunction on its claim for trademark infringement under the common law of Florida (Count IV). More specifically, the Aviation Authority seeks entry of an order enjoining the Defendants from using the BROOKSVILLE TAMPA REGIONAL AIRPORT mark. In support of this Motion, the Aviation Authority states as follows.

## MEMORANDUM OF LAW IN SUPPORT

## I. SUMMARY OF ARGUMENT

BROOKSVILLE TAMPA REGIONAL AIRPORT is false and misleading. It falsely suggests that BROOKSVILLE TAMPA REGIONAL AIRPORT is located in Tampa, when it is actually two counties and over forty (40) miles away. It falsely suggests that BROOKSVILLE TAMPA REGIONAL AIRPORT is a Tampa business or that it is associated with, endorsed by, sponsored by, connected to or otherwise affiliated with the Aviation Authority when, in fact, they are not.

## II. FACTS SUPPORTING INJUNCTION

1. The Aviation Authority uses a family of trademarks to identify facilities and airport related services throughout Florida and the nation. The Aviation Authority's three trademarks at issue are collectively referred to herein as "the Family of Airport Service Marks."

2. The Aviation Authority is the owner of Federal Registration 4,259,907 for SM TAMPAAIRPORT® for use in connection with "operation of an international airport and private aircraft airports, namely, airport services, airport baggage check in services, airport passenger check in services, airport passenger shuttle services between the airport parking facilities and the airport and airport ramp services in the nature of fastening and anchoring aircraft to airport tarmacs." *See* Exhibit A, Reg. No 4,259,907. The TAMPAAIRPORT® mark has been in use for over fifteen (15) years.

3. The Aviation Authority is also the owner of Federal Registration 4,252,281 for TAMPA INTERNATIONAL AIRPORT® for use in connection with "operation of an international airport and private aircraft airports, namely, airport services, airport baggage check in services, airport passenger check in services, airport passenger shuttle services between the

airport parking facilities and the airport and airport ramp services in the nature of fastening and anchoring aircraft to airport tarmacs." *See* Exhibit B, Reg. No. 4,252,281. The TAMPA INTERNATIONAL AIRPORT® mark has been in use for over sixty-five (65) years.

4. The Aviation Authority has developed common law trademark rights in the mark TAMPA EXECUTIVE AIRPORT™. This mark is used in connection with a general aviation airport facility located approximately 15 minutes from downtown Tampa. It operates as a reliever airport for the Aviation Authority's larger, international airport. The TAMPA EXECUTIVE AIRPORT™ mark has been in use for over three (3) years.

5. TAMPA INTERNATIONAL AIRPORT® is a major public airport located in Tampa, Florida, which is in Hillsborough County. This facility offers both scheduled commercial passenger services as well as general aviation services.[1]

6. The Aviation Authority operates TAMPA EXECUTIVE AIRPORT™ as a general aviation facility that is a reliever airport to TAMPA INTERNATIONAL AIRPORT®.

7. A significant portion of the Aviation Authority's revenues come from contracts related to commercial aviation development. Commercial aviation development broadly refers to the numerous activities that take place on the grounds of the airport. These activities include, for example, aircraft maintenance, repair, and overhaul ("MRO"). It also refers to services such as fueling, aircraft supply, and aircraft sales, manufacturing and supplies associated with aviation needs. The Aviation Authority's general aviation services include hangaring, flight instruction, fuelling of private aircraft and associated private pilot needs. Only entities that contract with the Aviation Authority are permitted to offer these services.

---

[1] "General aviation" is defined as the operation of civilian aircraft for purposes other than commercial passenger or freight transport, including personal business and instructional flying.

8.   BROOKSVILLE TAMPA REGIONAL AIRPORT is a general aviation facility located in Hernando County.  It is located over 40 miles from downtown Tampa.

9.   The Aviation Authority and the Defendants routinely compete with one another for contracts related to commercial aviation development.  The Aviation Authority is aware of at least one instance where it lost a commercial aviation development contract to the Defendants.  The Aviation Authority and the Defendants are also direct competitors for services related to general aviation.

## III. BACKGROUND

### 1.   Tampa International Airport® and the Aviation Authority

Tampa is well known as the birthplace of commercial aviation. On January 1, 1914 Tony Jannus flew the first scheduled commercial airline flight between St. Petersburg and Tampa.  The airport known today as TAMPA INTERNATIONAL AIRPORT® was established by the City of Tampa in 1928 as Drew Field.[2]  During World Word II, the United States Army Air Corps leased the airport from Tampa, changed the name of Drew Field to Drew Army Airfield, and used it as the base of operations for B-17s and B-25s. The airport was given back to Tampa at the close of the war.  The airport first began using the name TAMPA INTERNATIONAL AIRPORT® on October 15, 1947.

TAMPA INTERNATIONAL AIRPORT® consistently ranks as one of the best airports in the U.S.  In November of 2011, CNN named TAMPA INTERNATIONAL AIRPORT® as one of the top ten most loved airports in the world.[3]  It was the only U.S. airport to be listed.  Zagat Survey also ranked TAMPA INTERNATIONAL AIRPORT® as the "Best Overall U.S. Airport"

---

[2] *See* Drew Field Airport History (http://www.tampaairport.com/about/history/drew_field_airport_history.asp) (last visited 01/10/2013).
[3] *See* http://travel.cnn.com/explorations/life/10-most-loved-airports-981939?page=0,1 (last visited 01/10/2013).

in 2007 and 2008. [4] The Condé Nast publication voted TAMPA INTERNATIONAL AIRPORT®

as the third best U.S. airport in 2010.[5] The Aviation Authority has received numerous other

awards from both national and international organizations related to its management, outstanding

customer service, as well as the construction and design of its facilities. *See* Affidavit of Albert

Illustrato, Jr. at ¶14 (hereinafter "Illustrato Affid.").

      The Aviation Authority has invested a significant amount of time and money into

advertising and its Family of Service Marks over the course of many years. *See* Illustrato Affid. at

¶6. The Aviation Authority's advertising includes brochures, magazines, website material in the

State of Florida and throughout the United States. The Aviation Authority's Family of Airport

Service Marks are central to all of the Aviation Authority's branding efforts. *See* Illustrato

Affid. at ¶6. The Aviation Authority's Family of Airport Service Marks appears on the Aviation

Authority's literature as well as its website. *See id.* Due to the proper and consistent use of the

Family of Airport Service Marks and because the Aviation Authority has a yearly marketing

budget of approximately $3,800,000, the Family of Airport Service Marks have become a strong

source-identifier of the Aviation Authority's services. *See id.* As a result of the Aviation

Authority's branding efforts, the relevant consuming public now associates the Family of Airport

Service Marks with the Aviation Authority's services. *See* Illustrato Affid. at ¶6. Most

importantly, the public associates the Aviation Authority's Family of Airport Service Marks with

the Aviation Authority's airport and related services detailed in the Aviation Authority's

aforementioned trademark registrations. *See id.*

---

[4] *See* http://www.tampaairport.com/about/media/press_releases/2007/112007_Zagat_Survey.pdf (last visited 01/10/2013); http://www2.tbo.com/business/business/2008/nov/24/tampa-airport-ranked-best-zagats-nationwide-poll-ar-124023/ (last visited 01/10/2013).
[5] *See* http://www.tampaairport.com/about/media/press_releases/2010/20100929-tpa-3rd-best-airport.pdf (last visited 01/10/2013).

## 2. Family of Airport Service Marks

### TAMPAAIRPORT®

The Aviation Authority has been continuously using the TAMPAAIRPORT® mark for over fifteen years to identify commercial aviation facilities and related services. This includes general aviation services and commercial aviation development. On August 26, 2010, the Aviation Authority filed a federal trademark application for TAMPAAIRPORT® (Reg. No. 4,259,907) with the United States Patent and Trademark Office (USPTO) for use in connection with a wide variety of airport related services. The application claims a first use date of September 19, 1997. After amending its goods and services description and successfully arguing the TAMPAAIRPORT® mark has achieved secondary meaning through continuous use, the application was allowed by the USPTO. Prior to registering, the mark was published for opposition. Elite Transportation of Pasco, Inc. initiated an opposition with the Trademark Trial and Appeal Board ("TTAB"). Elite Transportation argued that the mark should not register as it was merely a "geographical location" and did not function as a trademark. *See* Ex. C (Opp'n No. 91/202,453). The Aviation Authority filed a Motion for Summary Judgment and established that the TAMPAAIRPORT® mark had acquired distinctiveness under 15 U.S.C.§1025(f). The TTAB granted the Aviation Authority's motion and the TAMPAAIRPORT® mark registered.

### TAMPA EXECUTIVE AIRPORT™

Hillsborough Aviation Authority has also used the trademark TAMPA EXECUTIVE AIRPORT™ since 2009 for use in connection with airport related services. This includes general aviation services and commercial aviation development. More specifically, the TAMPA EXECUTIVE AIRPORT™ mark is associated with a general aviation airport facility. The Aviation Authority has developed strong common law rights in the TAMPA EXECUTIVE

AIRPORT™ mark and the public has come to associate TAMPA EXECUTIVE AIRPORT™ with the Aviation Authority's facilities and services.

## TAMPA INTERNATIONAL AIRPORT®

For over sixty-five years, Hillsborough has also used the mark TAMPA INTERNATIONAL AIRPORT® to identify facilities and services related to the operation of international and private aircraft airports. This includes general aviation services and commercial aviation development. On August 24, 2010, the Hillsborough Aviation Authority filed a federal trademark application, in the USPTO for the mark TAMPA INTERNATIONAL AIRPORT® (Reg. No 4,252,281) for use in connection with "operation of an international airport and private aircraft airports." The Aviation Authority claimed a first use date of October 15, 1947. After amending its goods and service description and successfully arguing the TAMPA INTERNATIONAL AIRPORT® mark has achieved secondary meaning through continuous use, the application was allowed and published for opposition. Elite Transportation of Pasco, Inc. filed an opposition with the TTAB and again argued that the mark was a "geographical location" and not registerable. *See* Ex. D (Opp'n No. 91/202,419). The Aviation Authority ultimately prevailed in this opposition proceeding by demonstrating that the mark had acquired secondary meaning.

### B. Defrendants' Infringing Conduct

On October 23, 2012, Defendant Hernando County BOCC unanimously approved adopting the mark BROOKSVILLE TAMPA REGIONAL AIRPORT, for use in connection with Hernando County's airport. *See* Amended Complaint at Ex. C [Dkt. 15]. This was done as a part of a larger re-branding effort aimed at capitalizing off the goodwill associated with "Tampa." As of the filing of the initial Complaint, the use of the mark was limited to the

Facebook® pages of Hernando County BOCC and Hernando County Airport. *See* Complaint at Ex. D [Dkt. 1]. On or about January 9, 2013, Defendant Hernando County Aviation Authority commenced widespread use of the BROOKSVILLE TAMPA REGIONAL AIRPORT mark by emblazoning it upon the www.flyhernando.com website, using it on social media, and on stationary. *See* Composite Exhibit E. Notably, many of these examples display BROOKSVILLE TAMPA above REGIONAL AIRPORT.

Defendants' infringement can be illustrated with an example of a private pilot who wishes to fly to Tampa on business. That pilot is now presented with the option of landing at BROOKSVILLE TAMPA REGIONAL AIRPORT in addition to TAMPA EXECUTIVE AIRPORT™ or TAMPA INTERNATIONAL AIRPORT®. A pilot selecting BROOKSVILLE TAMPA REGIONAL AIRPORT will undoubtedly be surprised to learn that his chosen airport is nowhere near Tampa. He will also be surprised to discover that a cab ride to Tampa will run over $120.00.[6] Moreover, even if our pilot is not misled as to the geographic location of BROOKSVILLE TAMPA REGIONAL AIRPORT, he may nonetheless be confused as to the airport's affiliation. The similarity of the names undoubtedly creates the impression that BROOKSVILLE TAMPA REGIONAL AIRPORT is somehow sponsored or affiliated with TAMPA INTERNATIONAL AIRPORT® and/or TAMPA EXECUTIVE AIRPORT™. Given the Zagat ratings and Condé Nast rankings bestowed upon the Aviation Authority's services, one would naturally have a favorable impression of BROOKSVILLE TAMPA REGIONAL AIRPORT. But, again, our pilot would be mislead as there is obviously no connection or affiliation between the parties to this litigation.

---

[6] Based upon published rates of Yellow Cab of Tampa ($2.50 for first 1/8 mile and $.30 for each additional 1/8 mile).

The confusion generated by Defendants new name goes well beyond the above example. The parties also compete for lucrative contracts related to commercial aviation development. These contracts can be a significant source of revenue for airports. The Aviation Authority has lost at least one commercial aviation development contract to Defendant Hernando County Aviation Authority. The Defendants have undoubtedly lured MRO's and related companies away from the Aviation Authority by positioning themselves a Tampa based airport. And future contracts will likely be lost as long as the Defendants are permitted to associate themselves with Tampa and the award wining services of the Aviation Authority.

The Defendants are using a confusingly similar mark for identical goods and with the stated intention of capitalizing on the marketing efforts of the Aviation Authority. Moreover, these activities, if left unchecked, are undoubtedly likely to cause confusion As such, the Aviation Authority is not only likely to prevail in this dispute, but it is also entitled to a preliminary injunction to prevent further damage to the Aviation Authority's valuable brand and goodwill.

## IV.     LEGAL STANDARD.

This Court has the power to grant preliminary injunctive relief upon a showing of the following four elements:

> (1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest.

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.,* 299 F.3d 1242, 1246-57 (11th Cir.

2002). The facts of this case more than meet this standard and clearly compel injunctive relief to

protect the Aviation Authority's rights in its Family of Airport Service Marks.

**V.        ARGUMENT**

**A.  Aviation Authority Has a Substantial Likelihood of Success on Its False
Advertising under the Lanham Act Claim**

To establish the likelihood of success on the merits of a false advertising claim under §

43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the movant must establish: (1) the ads of the

opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive,

consumers, (3) the deception had a material effect on purchasing decisions, (4) the

misrepresented product or service affects interstate commerce, and (5) the movant has been - or

is likely to be - injured as a result of the false advertising. See *Johnson & Johnson Vision Care,*

*Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).

The BROOKSVILLE TAMPA REGIONAL AIRPORT mark is deceiving or, at a

minimum, has the capacity to deceive. This is because the mark leads people to believe that

Defendants' airport is located in Tampa when, in fact, it is not. Defendants' Motion to Abate

tacitly acknowledges this fact by arguing that "Tampa --as a region-- is far larger than the mere

city limits. Hernando County is included in the Metropolitan Statistical Area ("MSA") as defined

by the U.S. Census Bureau and is also a member of the Tampa Bay Partnership." *See* Motion to

Abate at Pg. 7 [Dkt. 7]. Defendants are mistaken in this regard as the U.S. Census Bureau does

not recognize a "Tampa Bay" MSA. Rather, the Census Bureau recognizes a much larger MSA

known as Tampa-St. Petersburg-Clearwater, FL Metropolitan Statistical Area (Code 45300).[7] This MSA includes the four counties of Hernando, Hillsborough, Pasco, and Pinellas. But the Defendants cannot rely upon this MSA as the mark does not reference Tampa-St. Petersburg-Clearwater. Nor does the mark even reference Tampa Bay. It simply references Tampa. Further, the Defendants proffer no serious argument that they are in any way geographically associated with the City of Tampa.

**B.  The Aviation Authority Has a Substantial Likelihood of Success on Its Trademark Infringement Claim.**

To prevail on its claims for infringement of a federally registered trademark (Count I), infringement of common law rights in a trademark (Count II) and Florida Common Law Trademark Infringement (Count IV), the Aviation Authority must show that: "(1) its mark has priority, and (2) the defendant's mark is likely to cause consumer confusion." *See Carvinal Brand Seafood Company v. Carvinal Brands, Inc.,* 187 F.3d 1307, 1309 (11th Cir.1999).

**1.  The Aviation Authority's Family of Airport Service Marks have Priority Over the Infringing Mark.**

Priority in trademark law is determined under this simple principle: "first in time equals first in right." *See Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1093 (9th Cir. 2004). It is clear that the Aviation Authority has priority trademark rights in its Family of Service marks.

The Aviation Authority owns federal trademark registrations for the marks TAMPAAIRPORT® and TAMPA INTERNATIONAL AIRPORT®. The registration for the

---

[7] *See* OMB Bulletin No. 10-02 http://www.whitehouse.gov/sites/default/files/omb/assets/bulletins/b10-02.pdf (last visited 01/10/2013).

mark TAMPAAIRPORT® indicates a first date of September 19, 1997. *See* Exhibit A. The registration for the mark TAMPA INTERNATIONAL AIRPORT® states a first use date of October 15, 1947. *See* Exhibit B. The Aviation Authority's registrations constitute prima facia evidence of the validity of the registrations, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in connection with the specified goods or services. *See* 15 U.S.C. §1115.

Further, the Aviation Authority has been continuously using the mark TAMPA EXECUTIVE AIRPORT™ since 2009. The Aviation Authority has clear priority of trademark rights in the geographic locations where the mark TAMPA EXECUTIVE AIRPORT™ is used in commerce.

### 2. Defendants' BROOKSVILLE TAMPA REGIONAL AIRPORT mark is Confusingly Similar to the Aviation Authority's Family of Airport Service Marks.

The Eleventh Circuit has devised a seven factor test to determine whether there is a likelihood of confusion between two marks. These factors include: a) the type of mark being asserted (i.e. how strong it is); b) the similarity of the marks; c) the similarity of the products the marks represent; d) the similarity of the parties' retail outlets and customers; e) the similarity of advertising media used; f) the defendant's intent; and g) actual confusion. *See Frehling Enter. Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999); *Lone Star Steakhouse & Saloon Inc. v. Longhorn Steaks, Inc.,* 122 F.3d 1379, 1382 (11th Cir. 1997). The relevant test is whether the use of the Defendant's competing trademark would result in a "likelihood of confusion." *See* 15 U.S.C. 1125 (a)(1). Notably this likelihood of confusion can be confusion as to source, confusion as to sponsorship, confusion as to affiliation, or confusion as to connection.

*See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1201 (11th Cir. 2001). The issue presented here is whether someone is likely to mistakenly believe that BROOKSVILLE TAMPA REGIONAL AIRPORT is somehow sponsored, connected, or affiliated with TAMPA INTERNATIONAL AIRPORT®, TAMPAAIRPORT®, or TAMPA EXECUTIVE AIRPORT™. Given the similarities between the marks and the identical nature of the services provided, such a mistaken belief is not only likely, it is inevitable.

### a) Type of Mark: The Aviation Authority's Family of Airport Service Marks are Strong Marks.

The first factor concerns whether the subject mark is considered a strong or weak mark. *See Bellsouth Advertising & Publishing Corp. v. The Real Color Pages, Inc.,* 792 F. Supp. 775, 781 (M.D. Fla. 1991). Strong marks are entitled to a greater degree of protection than weaker ones. *See id.* Four different categories of "distinctiveness" exist, each with a different degree of identification and each given a different level of protection. *See Grimes Contracting, Inc. v. Grimes Utilities, Inc.,* 2009 WL 88571, *4 (M.D. Fla.). They are from strongest to weakest: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *See id.* Marks that are arbitrary/fanciful or suggestive are considered strong marks.

In order to establish trademark rights in a geographic term, the mark must have acquired "secondary meaning." A prima facie case for secondary meaning is established after the mark has been in continuous use for five years. *See Welding Services, Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007)(citing 15 U.S.C. §1052(f)). Once proof of secondary meaning is established, a geographical term generally will be protected in the same manner as any "strong" mark. See *North American Aircoach Systems, Inc. v. North American Aviation, Inc.*, 231 F.2d 205, 107 U.S.P.Q. 68 (9th Cir. 1955), cert. denied, 351 U.S. 920, 100 L. Ed. 1452, 76 S. Ct. 709,

109 U.S.P.Q. 517 (1956) (NORTH AMERICAN). *Accord Anglo Fabrics Co. v. Fabriken Anglomac A/S*, 282 F. Supp. 454, 158 U.S.P.Q. 185 (D.D.C. 1968); *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 153 U.S.P.Q. 313 (5th Cir. 1967). *See Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 146 U.S.P.Q. 566 (7th Cir. 1965) (AMERICANA hotel held an arbitrary mark, entitled to strong protection); *Eastern Columbia, Inc. v. Waldman*, 30 Cal. 2d 268, 181 P.2d 865, 74 U.S.P.Q. 114 (1947).

In the present case, the TAMPAAIRPORT® mark has been in continuous use for 15 years and the TAMPA INTERNATIONAL AIRPORT® mark has been in continuous use for over 65 years. Further, the Aviation Authority addressed this issue, and argued successfully to the United States Patent and Trademark Office, that both TAMPAAIRPORT® and TAMPA INTERNATIONAL AIRPORT® marks have established secondary meaning. *See* Exhibits C and D.

The Aviation Authority has a strong case for secondary meaning in this case. The Defendants cited to a few examples of regional airports sharing a geographic designation with a larger airport facility. *See* [Dkt. 7 p. 5]. Notably, the Defendants examples fail to consider whether any of these airport names have acquired secondary meaning. Defendants also fail to consider whether the identified regional airports may, in fact, be owned by or formally associated with the larger airport. Many of these smaller airports may be designated reliever airports. Reliever airports are authorized by the larger airports to accept overflow traffic and relieve congestion form the larger airport. Absent such considerations, the Defendants' examples are meaningless.

During the prosecution phase of the Aviation Authority's trademark applications for the marks TAMPAAIPORT® and TAMPA INTERNATIONAL AIRPORT®, Defendants were given

the opportunity to oppose the applications on the grounds that the marks have not established the necessary secondary meaning required for registration on the Principal Register or for any reason that the Defendants might be damaged by the applications maturing into registration. A third party opposed the Aviation Authority's applications on the basis that the Aviation Authority should not be allowed trademark registrations for the marks TAMPAAIRPORT® and TAMPA INTERNATIONAL AIRPORT®. The Aviation Authority successfully defended these opposition proceedings on the basis that the marks have acquired the necessary secondary meaning required for a federal trademark registration. However, Defendants did not oppose the applications under any theory.

### b) Similarity of the Marks: The Competing Marks Are Nearly Identical.

The second factor, the similarity between the marks, also supports a finding of likelihood of confusion. A high degree of similarity between two marks increases the likelihood of confusion. *See Hako-Med USA, Inc. v. Axiom Worldwide, Inc.*, 2006 WL 3755332, *8 (MD Fla). Trademark similarity is judged by the respective sound, sight, and meaning of the marks. *See id.* In order to determine the similarity of the marks, a court compares the marks and considers the overall impressions that marks create, including the sound, appearance, and manner in which the marks are used. *Frehling*, 192 F.3d at 1337. The closer the marks are in appearance, the more likely reasonable consumers will mistake the source of the product that each mark represents. *Id.*

Here, the Aviation Authority uses the marks TAMPAAIRPORT®, TAMPA EXECUTIVE AIRPORT™ and TAMPA INTERNATIONAL AIRPORT®. Defendants have adopted the mark BROOKSVILLE TAMPA REGIONAL AIRPORT. Both the Aviation Authority and Defendants are using the terms "TAMPA" and "AIRPORT" in various

combinations that tends to create the mental impression that both the Aviation Authority and Defendants are providing airport services in Tampa or that the Hernando facility is somehow sponsored or endorsed by the Aviation Authority. This impression is bolstered by the fact that both marks use "Tampa" or "Airport" in the same Order.

In proceedings in the United States Patent and Trademark Office, consumer confusion has been held likely for marks that do not physically sound or look alike but that convey the same idea, stimulate the same mental reaction, or may have the same overall meaning. *Proctor & Gamble Co. v. Conway*, 419 F.2d 1332, 1336, 164 USPQ 301, 304 (C.C.P.A. 1970) (holding MISTER STAIN likely to be confused with MR. CLEAN on competing cleaning products); *see Ralston Purina Co. v. Old Ranchers Canning Co.*, 199 USPQ 125 (TTAB 1978) (holding TUNA O' THE FARM for canned chicken likely to be confused with CHICKEN OF THE SEA for canned tuna); *Downtowner Corp. v. Uptowner Inns, Inc.*, 178 USPQ 105 (TTAB 1973) (holding UPTOWNER for motor inn and restaurant services likely to be confused with DOWNTOWNER for the same services); TMEP §1207.01(b). While decisions issued by the United States Patent and Trademark Office are not binding on the federal courts, these decisions are certainly persuasive.

In its Motion to Abate, Defendants cite a few examples of regional airports sharing a geographic designation with a larger airport facility. [Dkt 7 p. 5]. In fact, one of the examples that Defendants provide is the Orlando International Airport and Orlando Sanford International Airport. A cursory Internet search reveals that there is a great deal of confusion in the marketplace and to consumers who are trying to fly into Orlando International Airport and end up at the Orlando Sanford International Airport. *See* Composite Exhibit F. Or, a consumer flies into the Orlando International Airport and has mistakenly made a rental car reservation at the

Orlando Sanford International Airport. *Id.* The Wikipedia page for Orlando Sanford International Airport clearly states under the airport name "Not to be Confused With Orlando International Airport." *See* Exhibit G. In addition, the Wikipedia page for Orlando International Airport clearly states under the airport name "Not to be Confused with Orlando Sanford International Airport." *See* Exhibit H. This confusion was generated despite the two airports being in adjacent counties and less than 20 miles away from one another. And this is exactly the consumer confusion that the Aviation Authority is trying alleviate and this is the exact kind of consumer confusion that is inevitable with the Defendants' adoption of the mark BROOKSVILLE TAMPA REGIONAL AIRPORT. The Aviation Authority should not have to place a disclaimer "Not to be Confused with BROOKSVILLE TAMPA REGIONAL AIRPORT" on every advertisement or corporate identification.

### c) Similarity of the Services & Consumers: The Services are Similar and are Sold to the Same Customers.

The next two factors, similarity of goods and identity of purchasers, also support a likelihood of confusion. The inquiry into the similarity between the Aviation Authority's and Defendants' services turns on whether these "are the kind that the public attributes to a single source." *Frehling*, 192 F.3d at 1338. The test is "not whether the goods [can] be distinguished . . . but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *Id.* Direct competition is never required. *Id.* The focus is on the reasonable belief of the average consumer as to the likely source of the goods. *Id.*

There is no doubt that there is overlap in consumers between the Aviation Authority and Defendants. Namely, travelers who use the Hernando Facility may also at some point use one of

the Aviation Authority's facilities.  Further, under the mark TAMPA EXECUTIVE AIRPORT™,

the Aviation Authority offers the same services that Defendants offer under the mark

BROOKSVILLE TAMPA REGIONAL AIRPORT.  As such, there is overlap in the parties'

customer base.  Given this overlap, and the similar nature of the services, consumer confusion

may occur given the very similar nature of the marks.  Inevitably, Defendants' use of the mark

BROOKSVILLE TAMPA REGIONAL AIRPORT will cause confusion among the public such

that the public may believe that Defendants' services are affiliated with, sponsored and/or

approved by the Aviation Authority.

### d)  Similarity of Advertising Media: The Parties Use the Same Advertising Campaigns.

The fifth factor, similarity of advertising campaigns, also supports a finding of likelihood

of confusion.  This factor looks to each party's method of advertising.  *Frehling*, 192 F.3d at

1339.  The standard is whether there is likely to be a significant enough overlap in the readership

of the publications in which the parties advertise that a possibility of confusion could result.  *Id.*

at 1340.

In the instant situation, the Aviation Authority and Defendants advertise using the same

mediums, *i.e.*, the Internet, social media, television, print ads.  Given that the parties are using

the same advertising channels to sell to the same customers, this factor weighs in favor of a

finding of a likelihood of confusion.

### e)  Defendant's Misappropriation of Aviation Authority's Family of Service Marks is Intentional.

If a defendant adopts a mark with the intention of deriving a benefit from the business

reputation of another, confusing similarity can be inferred.  *See John H Harland Co. v. Clark*

*Checks, Inc.*, 711 F.2d 966, 977 (11th Cir. 1983).  Improper intent can be shown through a strong

similarity of the marks and an awareness of potential confusion.  *Frehling*, 192 F.3d at 1340.

In the present case, Defendants clearly adopted the mark BROOKSVILLE TAMPA

REGIONAL AIRPORT to derive the benefit of the Aviation Authority's long standing

reputation in Tampa.  This position is supported by the following comments from Michael

McHugh at the October 23, 2012 Hernando County BOCC meeting:

> But additionally, Tampa has a favorable impression for business.  And the Tampa
> Bay Partnership has done an image study.  This is a study that was done to look at
> what do corporate executives think when they hear the word Tampa.  That is
> certainly part of our target demographic.  It is also a highly marketed term.  And
> there's a variety of channels that includes Busch Gardens.  Busch Gardens does
> not say we're in Carrollwood; they say Busch Gardens Tampa Bay.  That certainly
> shows the value of the brand and the effort to market it.  We have also prominent
> organizations, such as the Buccaneers and the Rays, which bring more focus upon
> the word Tampa.

Defendants are attempting to align themselves with the Aviation Authority in an effort to

divert consumers from the Aviation Authority's facilities.  It is clear that Defendants chose the

mark BROOKSVILLE TAMPA REGIONAL AIRPORT to piggyback off of the marketing

efforts of the Aviation Authority.  For example, a review of the Hernando County Convention

and Visitors Bureau website does not mention anything regarding "Tampa," "Tampa Bay,"

Busch Gardens, the Buccaneers or the Rays.  *See* Exhibit I.  This is because Defendants would

like to keep tourism in Hernando County and not divert tourism to Tampa which is

approximately 50 miles away from Tampa's downtown business district.

However, when it comes to the airport facility and drawing in new business that diverts

customers away from the Aviation Authority, Defendants have intentionally adopted a name that

creates the appearance that the Aviation Authority some how is affiliated or has endorsed the

Defendants' airport services operating under the name BROOKSVILLE TAMPA REGIONAL

AIRPORT.  This is where Defendants have crossed the line and this intent is alone sufficient to infer a likelihood of confusion.  *See AmBrit v. Kraft, Inc.*, 812 F.2d 1531, 1542 (11th Cir. 1986); *see also* 4 McCarthy on Trademarks and Unfair Competition § 23:116 (4th ed.)(noting that the Eleventh Circuit said that even an intent to "come as close as the law will allow" is an intent to derive benefit from the other party's reputation and "is therefore probative on the likelihood of confusion issue.")

Defendants had knowledge of the Aviation Authority's trademark rights in the Family of Airport Service Marks prior to the adoption of BROOKSVILLE TAMPA REGIONAL AIRPORT.  Further, the Aviation Authority sent Defendants a letter indicating its disapproval of the name prior to Defendants' adoption.  Consequently, Defendants' misappropriation of the Aviation Authority's Family of Service Marks is intentional.

### f)  Actual Confusion.

Evidence of actual confusion is not a prerequisite to an infringement determination and no actual confusion is known to date. *See Frehling,* 192 F.3d at 1340.  However, the touchstone of infringement is likelihood of confusion and not necessarily confusion. *See* Id.


### C.  Irreparable Harm

Once a party establishes a substantial likelihood of success on the merits, the second factor that must be demonstrated is a substantial threat of irreparable injury if an injunction is not granted.  The threat to the Aviation Authority's goodwill arising out of Defendants' appropriation and unauthorized use of a confusingly similar trademark clearly constitutes irreparable injury justifying issuance of an injunction.  The law on this is clear.  Infringement, by

its very nature, necessarily causes irreparable harm which can neither be quantified nor compensated by subsequent money damages. *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1314 (11th Cir. 1998) (if likelihood of consumer confusion is "particularly strong, the loss of reputation, trade and goodwill potentially flowing from the continued infringement justifies a finding of irreparable injury") (internal quotation marks, citation and emphasis omitted); *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1530 (11th Cir. 1985) ("[A] sufficiently strong showing of likelihood of confusion may by itself constitute a showing of . . . substantial threat of irreparable harm."); *James Burrough Ltd. v. Beef/Eater Restaurants, Inc.*, 272 F. Supp. 489, 493 (N.D.Ga. 1967) (defendant's use of plaintiff's trademark BEEFEATER as "the most essential and identifying part of a trade name or style" for defendant's restaurants "naturally and proximately resulted" in irreparable harm to plaintiff).

### D.  The Balance of Hardship Weighs Decidedly in Aviation Authority's Favor

The Aviation Authority's loss of goodwill in its Family of Airport Service Marks outweighs any economic damage that could befall on Defendants by ceasing use of the mark BROOKSVILLE TAMPA REGIONAL AIRPORT or any mark confusingly similar to the Aviation Authority's Family of Airport Service Marks.  The Aviation Authority is not seeking an injunction to prevent Defendants from competing in the marketplace.  There are a near infinite number of logos and trademarks Defendants can choose from that are sufficiently distinct from the Aviation Authority's Family of Airport Service Marks to avoid confusion.  The Aviation Authority is simply seeking an injunction to preclude Defendants' from deliberately creating confusion in the mind of consumers and falsely advertising that it services are being offered in Tampa, Florida.

### E.  The Public Interest Weighs in Favor of Issuing the Injunction

Finally, a preliminary injunction serves the public interest by protecting consumers from confusion as to source, affiliation or sponsorship. It is well settled that "the pubic interest is served by preventing consumer confusion in the marketplace." *See Davidoff & Cie, SA v. PLD International Corp.*, 263 F.3d 1304, 1304 (11th Cir. 2001). Indeed one of Congress' primary purposes in enacting trademark legislation was to ensure consumer confidence in purchasing brands or using services without being confused or misled. *Id*. at 1301 (citing 15 U.S.C. § 1114(1)). This is the very harm inflicted on the public in the instant case. The public interest is best served by preventing confusion in the marketplace. *Davidoff*, 263 F.3d at 1304. The public interest is best served by stopping Defendants' marketing tactics.

### F. The Aviation Authority Is Willing to Post a Bond

Fed. R. Civ. P. 65(c) requires the movant to post a reasonable security to protect Defendants should they suffer damages resulting from an improvidently granted preliminary injunction. While security does not appear necessary here, the Aviation Authority proposes that it submit a bond in the amount of $1,000.00.

## VI.   CONCLUSION

Defendants' activities are causing irreparable harm to the Aviation Authority's brands and goodwill. The Aviation Authority is likely to prevail in this case, and a preliminary injunction is warranted.

**WHEREFORE**, in view of the foregoing, the Aviation Authority demands that Defendants, and it agents, employees, servants, privies, successors and assigns, and all persons acting in concert, participation or combination with them, be temporarily, preliminarily, and permanently enjoined from:

a) Infringing the Aviation Authority's rights in the Family of Airport Service Marks;

b) Using the mark BROOKSVILLE TAMPA REGIONAL AIRPORT or any colorable imitation thereof upon any signage, awnings, billboards, products, product containers, websites, domain names, emails, advertising or promotional materials, either in print or broadcast or electronic form or other forms, either separately or compositely with other words, symbols or devices, as a corporate or trading name or as a service mark, in connection with the collection and preservation of human blood;

c) Imitating in any way, the Family of Airport Service Marks for the purposes of acquiring the Aviation Authority's trade and goodwill by imitation, fraud, mistake or deception;

d) Defendants be ordered, within 15 days of the date of this injunction, to destroy any material with the mark BROOKSVILLE TAMPA REGIONAL AIRPORT; and

e) For such other relief as the Court may deem proper.

Respectfully Submitted,

/s/Stefan V. Stein
Stefan V. Stein
Florida Bar No.: 300527
Michael J. Colitz, III
Florida Bar No.: 164,348
Debra Deardourff Faulk
Florida Bar No.: 634,425
GrayRobinson, P.A.
401 E. Jackson Street., Suite 2700

Tampa, FL 33602
Tel: (813) 273-5000
Fax: (813) 273-5145
stefan.stein@gray-robinson.com
michael.colitz@gray-robinson.com
debra.faulk@gray-robinson.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2013, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system and that all counsel of record that are CM/ECF

participants will receive a copy thereof.

/s/Stefan V. Stein
Stefan V. Stein

# 3668644 v4